DYOTHERM CORPORATION, Appellant,

v.

TURBO MACHINE COMPANY, Appellee.

No. 16440.

United States Court of Appeals
Third Circuit.

Argued June 8, 1967.

Decided March 14, 1968.

Clive S. Cummis, Schiff, Cummis & Kent, Newark, N. J. (Gerald Span, Newark, N. J., on the brief) for appellant.

Robert B. Frailey, Paul & Paul, Philadelphia, Pa. (Henry N. Paul, Jr., Stuart S. Bowie, Philadelphia, Pa., on the brief), for appellee.

Before STALEY, Chief Judge, KALODNER, Circuit Judge, and SHERIDAN, District Judge.

OPINION OF THE COURT

SHERIDAN, District Judge.

This is an appeal from an order of the district court, entered November 22, 1966, dismissing the complaint of appellant, Dyotherm Corporation, for want of prosecution.[1]

On August 29, 1962, Dyotherm filed a complaint against appellee, Turbo Machine Company, alleging breach of an agreement entered into in 1957 in settlement of an action in which Dyotherm had accused Turbo of appropriating its inventive ideas and processes. As a part of the agreement, Dyotherm licensed Grant and Harry Brewin, former officers of Dyotherm, to manufacture and sell in North America, South America and Ja-

---

1. Rule 41(b), Fed.R.Civ.P.

pan, "and nowhere else," certain machines covered by four Dyotherm patent applications, two of which resulted in patents and two of which were subsequently abandoned. The Brewins relicensed their rights to Turbo. Dyotherm alleged that Turbo breached the agreement by manufacturing the machines for sale outside of the agreed upon areas, and sought money damages and injunctive relief. During discovery proceedings, Turbo and Dyotherm stipulated the facts and filed cross motions for summary judgment. Dyotherm contended that "and nowhere else" was a negative covenant which precluded both the Brewins and Turbo from manufacturing textile machines for sale outside North America, South America or Japan, irrespective of whether they were covered by Dyotherm's patents. Turbo contended that this language merely limited the Dyotherm-Brewins' license geographically, and even if it were a negative covenant, it was binding only on the Brewins.

On April 20, 1964, the motions for summary judgment were denied and on July 8, 1964, Turbo's motion for reconsideration was denied. Turbo then moved to amend its answer to raise the defense that its machines were not covered by Dyotherm's patents and to assert a counterclaim for a declaration that its machines were not covered by any patent owned by Dyotherm. Dyotherm resisted enlargement of the issues beyond those covered by the stipulation. On February 8, 1965, the court allowed the motions.

On March 16, 1965, Turbo requested the court to set a trial date at its earliest convenience, stating the "long pendency has proven to be quite troublesome to the defendant in the conduct of its foreign operations." The court called a conference for May 14, 1965. It was not denominated a pre-trial conference, no order was issued and a transcript was not made. Apparently, Dyotherm sought time to explore the possibility of engaging patent counsel in view of the patent issues raised by the amended answer and counterclaim. A trial date was fixed for September 20, 1965, with the understand-

ing that Dyotherm would notify the court and Turbo if it did not intend to secure patent counsel, in which event the trial was to be rescheduled for the last week in June. Dyotherm did not secure patent counsel, and did not advise the court or Turbo. The trial date was continued from September 20 to October 4 because of illness of the trial judge. On that date Dyotherm's counsel appeared both late and unprepared. He requested a continuance for the reason that Mr. Lihn, Dyotherm's president and principal witness, was ill and could not appear in court for a week. When the court told counsel to proceed with other witnesses, he offered the implausible explanation that the other witness, an expert, was known only to Lihn and had been expected to accompany him to the trial. The court demanded proof of Lihn's illness before ruling on the request for a continuance. Court adjourned until 9:30 A.M. of the next day, Tuesday, October 5, 1965, to permit counsel to obtain this proof. Before adjournment, the following occurred:

[THE COURT]: "I might say I will not accept a letter from a doctor as evidence of the illness of the party in question.

"MR. RADIN: May I ask Your Honor what you would accept because my information is that he will be out for a week.

"THE COURT: That is up to you, Mr. Counsel, to present your case. You are asking for a continuance, and you are a lawyer. You ought to know how to establish the facts that you want to establish. I will not accept a letter of the doctor."

Later, counsel asked the court's law clerk whether the court would accept an affidavit from the doctor. The law clerk replied that he could not speak for the court, but that it was his impression that an affidavit would not be sufficient.

On October 5, counsel again appeared late. He advised the court the doctor could not be present because of some emergencies, and offered the doctor's affidavit. Turbo refused to accept the af-

fidavit, and moved that the case be dismissed.[2] The court indicated orally that it would dismiss, noting the matter of patent counsel and counsel's late appearance that morning.[3] The dismissal was entered on October 21, 1965.

Dyotherm filed a request for reconsideration, accompanied by affidavits of Lihn's illness, including the affidavit which had been excluded on October 5. In an opinion filed on January 3, 1966, the court indicated that it would vacate the judgment of dismissal if Dyotherm paid Turbo its costs and expenses for October 5 and 6, including a reasonable counsel fee. After a conference with both counsel, the court on March 16, 1966, ordered Dyotherm to pay $1,185 for expenses and counsel fees, but did not fix a time for payment. It also required Dyotherm to reply to Turbo's counterclaim within ten days.[4]

On June 7, 1966, Turbo, not having received payment, requested the court to confirm and render absolute the judgment of dismissal. On June 21, 1966, Dyotherm made the payment but Turbo returned it on June 22, 1966, because

"[i]t would be most unreasonable to suppose that the Court intended that the filing of a reply to the counterclaim, which was limited to a ten-day period, was to precede reinstatement of the case." Counsel stated payment had not been made earlier because of Dyotherm's poor financial condition. On August 25, 1966, the court wrote to counsel stating that Dyotherm's financial condition during the pendency of the case was relevant to the alleged reasons for the delays, and requested that proof be submitted within fifteen days. At the request of Turbo, the court on August 29, 1966, clarified its request for proof of Dyotherm's financial condition. Dyotherm failed to produce the proof within the required time and the judgment of dismissal was entered on November 22, 1966.

Dismissal of a complaint for want of prosecution is within the court's sound discretion. An order of dismissal will be reversed only upon a showing of an abuse of discretion. In determining whether there has been an abuse of discretion, all the pertinent circumstances must be considered. Dismissal is a harsh

---

2. The affidavit stated:
  "4. I was called to his aforesaid home on Sunday evening, October 3, 1965, where I examined him and found that he had an acute upper respiratory tract infection. I ordered that he remain in bed for several days, at least, and not go out. I returned to his said home the next evening, examined him again, confirmed my diagnosis, and repeated the above orders. My prognosis for him is good, but he cannot venture out until this coming Thursday, October 7, 1965."
  The court indicated that it would accept the affidavit if Turbo's counsel would accept it; otherwise, the case would be dismissed. The following then occurred:
  "MR. PAUL [Turbo's counsel]: One of the things that disturbs me about the affidavit is it does not say when the physician first examined—
  "MR. RADIN [Dyotherm's counsel]: Yes, it does. I will read the complete affidavit.
  "THE COURT: I don't want to hear it.
  "MR. PAUL: He said he examined him on Sunday. He doesn't say this

was his first examination. We don't know how long Mr. Lihn—
  "THE COURT: I have never accepted, where there is any contest about it, where counsel on the other side hasn't agreed, I have never accepted anything but the presence of the doctor in court to testify and be subject to cross-examination. I won't accept it in this case unless Mr. Paul agrees that it should be accepted.
  "MR. PAUL: I am not satisfied with the affidavit, Your Honor."

3. Counsel was almost a half hour late. He protested that he thought court was to convene at its regular time of 10:00 A.M. rather than 9:30 A.M., but the record is clear that 9:30 A.M. was the designated time. For this counsel was held in contempt and fined $25.

4. Dyotherm did not think a reply was required because it contended that the counterclaim sought an adjudication of matters raised as an affirmative defense. In denying Turbo's motion for judgment on the counterclaim for failure to reply, the court stated that the question posed by Dyotherm "is not free from doubt."

sanction which should be resorted to only in extreme cases. The power of the court to prevent undue delays and to control its calendars must be weighed against the policy of law which favors disposition of litigation on its merits. Link v. Wabash R.R. Co., 1962, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734; Meeker v. Rizley, 10 Cir. 1963, 324 F.2d 269; 5 Moore, Federal Practice para. 41.11[2] (2d ed.).

There is no indication that Dyotherm engaged in dilatory tactics prior to May 1965, when the case had been pending over two and one-half years. Indeed, Dyotherm cooperated in the motions for summary judgment. The delays after denials of the motions were occasioned by Turbo's motion for reconsideration and then for permission to amend its answer and to file a counterclaim. We appreciate Turbo's concern for an early trial date. It must be remembered, however, that Turbo raised the patent issues at a rather late date. The motion to amend was not filed until July 1964, and it was not allowed until February 1965. The explanation given for failure to advise that patent counsel had not been secured was that continuous efforts were being made to engage patent counsel but the president of Dyotherm insisted the company could not afford it. There were a series of hearings, unrelated to the main issues, and on which much time and effort was expended by all concerned. It is doubtful if Dyotherm had sufficient time to take the deposition of the doctor in time for its introduction in evidence the following day. The court recognized that its order directing payment of costs and counsel fees to Turbo was indefinite.[5]

■ Under all the circumstances the district court should not have applied the harsh penalty of dismissal. We do not condone the actions of Dyotherm and its counsel. The tardiness of counsel, especially on October 5 showed disrespect, and failure to be prepared with other witnesses is inexcusable. It is inconceivable that counsel would meet his expert for the first time at the trial. But the price for these derelictions has been exacted; counsel has been held in contempt and fined, and Dyotherm is required to pay a substantial amount to obtain relief from the order of dismissal.

The order of the district court dismissing the complaint for want of prosecution will be reversed. Since that order included a dismissal of Turbo's counterclaim as moot, the counterclaim will be reinstated.

■

5. At the hearing on the motion to confirm the judgment of dismissal, the following occurred:

"THE COURT: Well, Mr. Schiff has made the best argument possible for his client. There is only one thing that has not been mentioned, and that is that there was not any actual time fixed for the payment of the expenses of counsel. I know that ten days was fixed for the filing.

"MR. FRAILEY [Turbo's counsel]: Yes, sir.

"THE COURT: The filing of the reply to the counterclaim, and it is a possible inference that the intention was to limit the payment to ten days, but it is not too definite a situation. I am not going to make an order at this time. I want to consider it."