**C.B.H. RESOURCES, INC., Plaintiff,**

v.

**MARS FORGING COMPANY, a limited partnership, and R.T. Woodings Management Corp. General Partner, d/b/a Mars Forging Company, Defendants.**

Civ. A. No. 82–683.

United States District Court,
W.D. Pennsylvania.

July 14, 1983.

Frank E. Little, Little & Ogg, Pittsburgh, Pa., for plaintiff.

Stanley M. Billingsley, Carrollton, Ky., Edward C. Schmidt, Susan Hileman Malone, Rose, Schmidt, Dixon & Hasley, Pittsburgh, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COHILL, District Judge.

### Introduction

This case is before us on the defendants' Motion for Involuntary Dismissal Under Fed.R.Civ.P. 41(b) or for Sanctions. Our findings of fact are based upon hearings conducted on March 10, 1983 and April 14, 1983, as well as several affidavits filed in connection with this motion, and the depositions already included in the file. While we recognize that dismissal with prejudice is an extremely harsh remedy for violations of the Federal Rules of Civil Procedure by litigants, *see Harris v. Cuyler,* 664 F.2d 388 (3d Cir.1981), we are satisfied that the conduct of plaintiff's president and majority stockholder in this case is sufficiently egregious to justify such a ruling.

### Findings of Fact

This action was commenced on April 22, 1982 by C.B.H. Resources, Inc., to recover damages from an alleged breach of an exclusive distributorship. The plaintiff, a Kentucky corporation owned mainly by Cecil Clifford, alleged that it was given the exclusive right to distribute a product manufactured by the defendant (referred to as "sucker rods" or "oil pumping stems") within a 600 mile radius of Elizabethtown, Kentucky. (We will refer to the defendant in the singular because the two names in the caption appear to have done business as a single economic entity.)

Based on the discovery conducted through the early part of 1983, the plaintiff's claim of an exclusive distributorship appeared to rest primarily on conversations which took place between March of 1981 and May of 1981 between Robert Woodings, the controlling owner of the defendant, Timothy Houlihan, then sales director for the defendant, and Cecil Clifford, president of the plaintiff. *See* Deposition of Cecil Clifford at 32 (November 11, 1982). From March of 1981 until he left the employ of the defendant in January of 1982, Mr. Houlihan appears to have been the main contact between plaintiff and defendant.

Craig Higgins, a mutual acquaintance, introduced Mr. Houlihan to Mr. Clifford. Prior to the incorporation of C.B.H. Resources, Inc., Mr. Clifford was an officer, director and a 50% shareholder with Mr. Higgins in Oil Patch Equipment Corporation, a corporation which the plaintiff has contended also served as a distributor for defendant. *Id.* at 34–35.

The plaintiff brought this suit on April 20, 1982. Counsel for the plaintiff, Phillip Warf, soon realized that Mr. Houlihan's testimony would be crucial at trial. *See* Affidavit of Phillip R. Warf at ¶ 3 (February 22, 1983, filed March 1, 1983). (Mr. Warf was counsel for the plaintiff until March 2, 1983 when Mr. Clifford fired him.) In his affidavit, Mr. Warf gave his view of the facts leading to the motion currently before us, stating:

4. That I discussed with Cecil Clifford, the necessity of my talking with Tim Houlihan and my desire to have a stenographer record Mr. Houlihan's answers to my questions after his having been placed under oath, prior to scheduling a discovery deposition.

5. That Mr. Clifford agreed to contact Mr. Craig Higgins, whom Mr. Clifford knew to be a close friend of Mr. Houlihan, in order to attempt to arrange to have Mr. Houlihan give a statement concerning his knowledge of the facts in issue in this action.

6. That arrangements for Mr. Houlihan's statement took approximately 3 to 4 months to finalize.

7. That at one point during the time period when we were arranging for Mr. Houlihan to give his statement, Mr. Clifford advised me that Mr. Houlihan would like to have a subpoena for the avowed purpose of showing that he was not "siding" with either party.

8. That I explained to Mr. Clifford that the issuance of a subpoena to command Mr. Houlihan to appear at my office in Kentucky was out of the question; I heard nothing more concerning a subpoena until the day that Mr. Houlihan appeared in my office and gave his statement.

9. That in January, 1983, Mr. Clifford informed me that he, through Mr. Craig Higgins, had secured Mr. Houlihan's agreement to meet and to give his statement, either in Kentucky or in Pennsylvania.

10. That since the cost of sending me to Pennsylvania was so much greater than the cost of bringing Mr. Houlihan to Kentucky, it was decided to have Mr. Houlihan come to Kentucky to give his statement.

11. That on the 18th day of January, 1983, Mr. Houlihan appeared in my office at 1:00 p.m. for the purpose of giving his statement; this being the first time that I had met or spoken with Mr. Houlihan.

12. That those present during the actual taking of Mr. Houlihan's statement were myself, Mr. Houlihan, Mr. Clifford, Mr. Higgins and a stenographer; Mr. Stephen Horner, attorney for Mr. Craig Higgins, was present prior to the actual taking of the statement, but he left prior to the commencement of the statement.

13. That following the actual taking of Mr. Houlihan's statement, Mr. Clifford and Mr. Higgins became engaged in a conversation and while they were so engaged, Mr. Houlihan handed me a document which had been typed on plain white paper and which was entitled 'Subpoena', and Mr. Houlihan requested that I 'validate his subpoena'.

14. That the document handed to me by Mr. Houlihan was not a subpoena; it appeared to be a form of *Notice to Take Deposition* with the word 'Subpoena' as a title and with the word 'statement' in place the word 'Deposition'. This document was not signed and did not carry any seal, purporting to be a seal of court or otherwise.

15. That when Mr. Houlihan presented the document to me, I was surprised and proceeded to explain to Mr. Houlihan that the document was not a subpoena and, further, that no subpoena could possibly have been issued to coerce his pres-

ence in Kentucky. At this time I proceeded to explain to Mr. Houlihan that he would be subpoenaed to give a deposition in the future but that at that time both myself and counsel for the Defendant would have a [sic] ample notice and opportunity to attend and participate. I further offered to give Mr. Houlihan a letter explaining his presence in my office if he required some type of documentary proof as to his reasons for traveling to Kentucky.

12. [sic] * That after this explanation, Mr. Houlihan seemed to understand the situation and to be quite satisfied. Mr. Houlihan stated that a letter from me explaining his presence in Kentucky was not necessary and he took the document entitled 'Subpoena' with him when he and Mr. Higgins left my office together.

13. [sic] * That I have not seen this document at any time other than the short period described above and, at that time, after the taking of the statement, the document was totally unsigned and contained no seal of any nature.

*Id.* at ¶ 4 *et seq.*

In paragraphs ten through fifteen of an affidavit dated January 31, 1983 and filed February 4, 1983, Mr. Houlihan described the events leading up to the taking of his statement in Kentucky:

10. During the period of time that there has been litigation between CBH Resources and Mars, except for some telephone conversations with the lawyers for Mars, and except as hereinafter stated, I have not spoken to anyone about the litigation because I had left Mars in approximately January, 1982, and did not believe it appropriate to engage in multiple discussions with opposing parties to litigation, both of whom I knew. .

11. During the litigation, from time to time, I received phone calls from Mr. Craig Higgins, of Oil Patch Equipment Company, who talked to me about the litigation. Oil Patch Equipment Company is located in Louisville, Kentucky, and

Mr. Higgins was, and maybe still is, a business associate of Cecil Clifford's (one of the owners of CBS Resources).

12. Several weeks ago, I was called by Mr. Higgins and asked to give a deposition in this litigation. Previously, he had made the same request to me. Consistently, I have sought not to get involved in the litigation and repeated this to Mr. Higgins. Mr. Higgins advised me that if I did not voluntarily appear for a deposition, that the U.S. Marshals would be directed to come and escort me to Pittsburgh for a deposition and pursuant to a subpoena. Obviously, because I am in the process of starting a new business, I would not want to be escorted anywhere by several U.S. Marshals. Further, because I had the time available to give a deposition, the scheduling of it within the past several weeks was important to me. Mr. Higgins told me that CBH Resources would pay for my trip to Kentucky for the deposition and my expenses in staying there. I told him that I would go but only so long as I was served with a subpoena, because I did not want anyone to think that I was voluntarily appearing for a deposition.

13. On Sunday, January 16, 1983, I travelled to Louisville, Kentucky and was met by Craig Higgins at the airport. On Tuesday, January 18, 1983, I had lunch with Mr. Higgins and an individual who he introduced as his attorney, Steve Horner. At that luncheon meeting in Elizabethtown, Kentucky, I was handed a typed document entitled 'subpoena'. I cannot presently locate my copy of this document. The document was not of the form of Exhibit "A" attached to this Affidavit. [Exhibit A is a copy of a proper subpoena for this district]. I was told by Mr. Higgins and Mr. Horner that this was a subpoena and that I was to be at the offices of the lawyer for CBH Resources to give a deposition that afternoon.

14. Thereafter, I went to the office of Mr. Philip Warf, was sworn in by a Court Reporter, and was asked a series of ques-

---

* The numbering is incorrect.

tions by Mr. Warf to which I gave answers as truthfully as possible. To the best of my knowledge, Mr. Warf was not aware of the document marked 'subpoena'.

15. I have now been advised by Mr. Edward C Schmidt who told me that he spoke with Mr. Warf and that the document with which I was served was not a subpoena and I did not give a deposition. The only reason that I went to Kentucky was because it was represented to me by Mr. Higgins and confirmed by his lawyer thereafter that I was being served with a subpoena to attend a deposition. Had I been told that the document was not a subpoena, I would not have gone to Kentucky. I should state, however, that I did not realize that a deposition required, or allowed, notice to the other part [sic] to a lawsuit and their participation. The simple fact of the matter is that a subpoena was a prerequisite for my going to Kentucky to give a deposition or a statement.

We received affidavits from Mr. Horner and Mr. Higgins denying that they told Mr. Houlihan that the document they gave to him was a subpoena. Mr. Horner, an attorney, essentially indicated that he had no knowledge of the events described by Mr. Houlihan. He did recall having lunch with Mr. Houlihan. Mr. Horner further stated that Mr. Houlihan had called him on February 8, 1983 and told me that the Houlihan affidavit of January 31, 1983 was not the document he (Houlihan) had signed. *See* Affidavit of Stephan G. Horner at ¶ 7 (February 25, 1983, filed February 28, 1983).

Mr. Higgins indicated in his affidavit that the Houlihan affidavit was inaccurate. According to Mr. Higgins:

After Mr. HOULIHAN arrived in Kentucky on January 16, 1983 and being naturally somewhat nervous about becoming involved in this sensitive litigation between his former employer, MARS, and one of its distributors, C.B.H., he inquired as to whether I had ever testified subject to a subpoena in litigation before and I told him I had. He then asked what a subpoena looked like and I had a subpoena in my files that had been served on me in previous litigation some years ago. That is the only discussion pertaining to a subpoena whichever transpired between HOULIHAN and myself.

Affidavit of J. Craig Higgins at ¶ 13 (February 25, 1983), filed February 28, 1983).

Mr. Warf, Mr. Horner, and Mr. Higgins were given personal telephonic notice of the hearing we conducted on March 10, 1983. All three indicated a desire to rest on their affidavits in regards to their role in this matter and to make themselves available for questioning over the telephone if we deemed it necessary. Counsel had no objection to this procedure.

At the March 10, 1983 hearing, we received live testimony from Mr. Cecil Clifford. Mr. Clifford indicated that he had worked closely with Mr. Higgins on a joint business venture in the recent past. *See* Testimony of Cecil Clifford· at 4–5 (March 10, 1983). Mr. Clifford conceded that he requested that Mr. Higgins encourage Mr. Houlihan to come to Kentucky to give a sworn statement. *Id.* at 6. Unlike Mr. Higgins, Mr. Clifford had no memory of any subpoena or other document being given to Mr. Houlihan at the luncheon meeting of Messrs. Clifford, Houlihan, Higgins and Horner. *Id.* at 8.

At the March 10 hearing, we attempted, without success, to reach Mr. Houlihan by telephone in the state of Maine. We ordered him to appear at a later hearing conducted on April 14, 1983. At the second hearing, Mr. Houlihan appeared and gave testimony which was consistent with his earlier affidavit. Mr. Houlihan also testified that Mr. Higgins had contacted him several days prior to his testimony. On direct examination by Edward C. Schmidt, counsel for the defendant, Mr. Houlihan testified as follows:

Q. Okay. Have you had since the time that you signed the affidavit in my office, have you had other discussions with Mr. Higgins?

A. He has called me several times.

Q. Can you tell me what those discussions have entailed?

A. He has asked me to take care of him on this subpoena.

Q. What has he said to you?

A. To go along with him on it, it being an old subpoena of his.

Q. Did he ever make a statement that he wants you to protect him before that Judge in Pittsburgh, something along those lines?

A. No, I do not recall that he said that.

Q. Did he suggest to you that you change the statement that you have contained within your affidavit?

A. No. he only—to quote is, 'Will you take care of me on this subpoena thing.'

Q. What did you say to him?

A. I told him that I was going to court to tell the truth and that was all I was going to do.

Q. When was your last conversation with Mr. Higgins?

A. Several days ago.

Q. What did he ask you at that time?

A. Reiterated the same question.

MR. SCHMIDT: Your Honor, I have no further questions of Mr. Houlihan.

THE WITNESS: However, he did call me back several hours after that conversation and said, "Well, maybe you would be better off just to tell the truth," and hung up the phone. That was it.

MR. SCHMIDT: Thank you.

Testimony of Timothy E. Houlihan at 10–11 (April 14, 1983).

Having examined the affidavits and listened to the testimony of Mr. Clifford and Mr. Houlihan, we find, as a matter of fact, that we fully believe Mr. Houlihan and Mr. Warf and disbelieve Messrs. Clifford, Horner, and Higgins. We find, as a matter of fact, that Mr. Clifford knew that he could not properly obtain a subpoena to procure the sworn statement of Mr. Houlihan but instructed his friend Mr. Higgins, to use whatever means were necessary to secure Mr. Houlihan's statement. Given the fact that Mr. Clifford asked Mr. Warf specifically about the propriety of the issuance of a subpoena for Mr. Houlihan, we can only conclude that the purported subpoena was given to Mr. Houlihan at the luncheon meeting with the full knowledge of Mr. Clifford.

Mr. Warf's conduct at the close of the taking of Mr. Houlihan's statement demonstrates a total lack of knowledge of the methods used to secure Mr. Houlihan's testimony. We believe that Mr. Warf told the whole truth in his affidavit. Mr. Clifford reacted to his counsel's honesty by promptly terminating his employment. The conduct of Messrs. Clifford, Higgins, and Horner in this matter was reprehensible. All of these men knew that they lacked a valid subpoena for Mr. Houlihan and, indeed, that they could not have obtained a genuine subpoena under the circumstances. Nonetheless, they secured Mr. Houlihan's presence in Kentucky and his sworn statement by means of false threats and a bogus subpoena. Mr. Clifford initiated this abuse of process in spite of advice from his counsel, Mr. Warf, that a subpoena was not obtainable for a sworn statement. Mr. Higgins not only took part in this scheme with his attorney, Mr. Horner, at his elbow, but later tried to get Mr. Houlihan to perjure himself before this Court. We are shocked by the role of Mr. Horner, a licensed attorney, in this entire sordid affair. While it is not clear from the evidence in this case that Mr. Horner personally misrepresented the so-called subpoena to Mr. Houlihan, it is obvious that he was at least present during the luncheon meeting at which the bogus subpoena was given to Mr. Houlihan. As an officer of the court, Mr. Horner should not have permitted a layman to be deceived as to the import of legal process.

In short, we find that the evidence adduced from live testimony and affidavits clearly demonstrates that Messrs. Clifford, Higgins and Horner have committed a serious abuse of the process of this Court and violations of the Federal Rules of Civil Procedure.

### Conclusions of Law

We have jurisdiction over this case pursuant to 28 U.S.C. § 1332.

The actions of Messrs. Clifford, Higgins and Horner in securing a sworn statement from Mr. Houlihan constitute clear violations of Rules 30 and 45 of the Federal Rules of Civil Procedure. This conduct may also have represented a violation of one or more criminal statutes. *See, e.g.,* 18 U.S.C. § 1503 (Endeavoring to influence a witness), 18 U.S.C. § 2 (Aiding and abetting), 18 U.S.C. § 371 (Conspiracy).

Rule 41(b) of the Federal Rules of Civil Procedure authorizes involuntary dismissal as a sanction for failure to comply with the rules. We fully recognize that "[d]ismissal is a harsh sanction which should be resorted to only in extreme cases." *Dyotherm Corp. v. Turbo Machine Co.,* 392 F.2d 146, 148–149 (3d Cir.1968); *Accord Donnelly v. Johns-Manville Corp.,* 677 F.2d 339, 340–343 (3d Cir.1982); *cf. Harris v. Cuyler,* 664 F.2d 388, 390 (3d Cir.1981). Were this a case where rule violations resulted from the conduct of the plaintiff's counsel, we would be extremely reluctant so severely to punish a claimant for the transgressions of his attorney. Here, however, we face a different and, we think, highly unusual set of facts. Having received sound advice from his attorney, the president and owner of the plaintiff corporation chose to disregard that advice and to procure Mr. Houlihan's sworn statement through a scheme totally at odds with the Federal Rules of Civil Procedure and the notions of fairness central to our system of litigation.

We cannot allow a party which has demonstrated such a flagrant disregard for our rules simply to receive a small penalty and then go forward with its claim. Where the violations of the rules are as serious as they are here and the conduct is that of the plaintiff itself after advice of counsel to the contrary, dismissal with prejudice is the only appropriate sanction.